UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CHRISTOPHER M. MONGIELLO,

                               Plaintiff,

       - against -

CITY OF NEW ROCHELLE, *et al.*,
                               Defendants.
-------------------------------------------------------------x

**OPINION & ORDER
ON MOTION FOR
SUMMARY JUDGMENT**

No. 24-CV-4842 (CS)

Appearances:

Christopher M. Mongiello
Pelham Manor, New York
*Pro Se Plaintiff*

Brian S. Sokoloff
Vincent E. Ferry
Sokoloff Stern LLP
Carle Place, New York
*Counsel for Defendants*

Seibel, J.

       Before the Court is the motion for summary judgment of Defendants City of New

Rochelle, Office of The City Marshal[1] and Wil Ortiz a/k/a Will Ortiz ("Defendants"), (ECF No.

55), and the cross-motion for sanctions of Plaintiff Christopher M. Mongiello, (ECF No. 62).

For the following reasons, Defendants' motion is GRANTED, and Plaintiff's cross-motion is

DENIED.

---

[1] The spelling of "Marshal" is inconsistent throughout the parties' filings, with both
parties sometimes using one "L" and other times using two.  For consistency, the Court uses one
"L," as that appears to be the more widely accepted spelling.  *See Marshal*, Merriam Webster,
https://www.merriam-webster.com/dictionary/marshal (last visited Apr. 8, 2026).

I.    **BACKGROUND**

A.    **Facts**

The following facts are based on Defendants' Local Civil Rule 56.1 Statement, (ECF No. 56 ("Ds' 56.1 Stmt.")), Plaintiff's Response thereto, (ECF No. 67 at 1-13 ("P's 56.1 Resp.")), and the evidentiary materials submitted by the parties, and are undisputed unless otherwise noted.[2]

In 2006, Plaintiff and his then-wife, Tiffany Eastman, purchased a condominium in New Rochelle, New York for $610,000, financing the purchase through two mortgages. (Ds' 56.1 Stmt. ¶¶ 1-2.) After his divorce in 2010, Plaintiff obtained full ownership of the condominium. (*Id.* ¶ 3.) In 2013, however, the property became the subject of foreclosure proceedings. (*Id.* ¶ 4.)[3]

Although the initial lender was IndyMac, the Federal Deposit Insurance Corporation assumed control of Plaintiff's mortgage when IndyMac failed. (*Id.*) During the foreclosure

---

[2] I disregard those portions of Plaintiff's 56.1 Response purporting to "qualif[y]" or add "context" to undisputed facts by interjecting additional facts or legal arguments. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (improper to "interject[ ] arguments and/or immaterial facts in response to facts asserted by Defendant[s], without specifically controverting those facts"); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding responses that "do not specifically dispute Defendants' statements or consist of conclusory allegations, speculation or conjecture"); *see also Warren v. Ewanciw*, No. 15-CV-8423, 2019 WL 589488, at *2 n.4 (S.D.N.Y. Feb. 13, 2019) (disregarding "denials that quibble[] with Defendant[s'] phraseology, but do[] not address the factual substance asserted by Defendant[s]"). (Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and alterations. The Court will send Plaintiff copies of any unpublished cases cited in this Opinion and Order.)

[3] Defendants attribute the foreclosure action to Plaintiff's failure to timely make his mortgage payments. (Ds' 56.1 Stmt. ¶ 4.) Plaintiff argues that he went into default because his loan servicers "imposed fraudulent and unauthorized charges that were neither due nor owing." (P's 56.1 Resp. ¶ 4.) The cause of the default is immaterial to the instant motion.

2

action, Plaintiff entered into a loan modification with Ocwen Loan Servicing ("Ocwen"), which he understood to be an IndyMac affiliate. (*Id.* ¶ 5.)

In January 2019, Plaintiff began receiving mortgage statements from PHH Mortgage ("PHH") that listed Eastman as a co-borrower. (*Id.* ¶ 6.) After PHH refused to remove Eastman's name or honor the loan modification to which Plaintiff had agreed with Ocwen, Plaintiff filed suit in July 2020 against HSBC Trust, the holder of the note. (*Id.* ¶¶ 6-7.)[4] The suit was dismissed in 2022 for lack of proper service. (*Id.* ¶ 7.)

On December 25, 2021, Eastman served Plaintiff with a contempt motion related to his failure to remove her name from the mortgage as required by the divorce decree. (*Id.* ¶ 8; P's Depo. at 25:19-26:20.) On April 7, 2023, Plaintiff appeared in Westchester County Supreme Court, and he and Eastman entered into a settlement agreement under which Plaintiff agreed to either refinance or sell the condominium within 180 days. (Ds' 56.1 Stmt. ¶ 9.) On May 1, 2023, the court so-ordered the transcript, and the Westchester County Clerk entered the settlement. (*Id.* ¶ 10.) The settlement order provided that if Plaintiff failed to modify, refinance or pay off the mortgage by 5:00 p.m. on October 4, 2023, he would have to vacate the premises by 5:00 p.m. the following day. (*Id.* ¶ 11.) If he failed to do so, the settlement order entitled Eastman to have Plaintiff removed from the premises by law enforcement without further motion practice or court order. (*Id.* ¶ 12; ECF No. 57-3 ("Eviction Order") at 4-5.)[5]

---

[4] Plaintiff testified that because the loan servicer wrongly included Eastman's name on the mortgage, he believed that he was no longer obligated to pay the mortgage. (*See* ECF No. 57-4 ("P's Depo.") at 24:17-25:13.)

[5] Excluding deposition transcripts, which are cited according to the page numbers on the transcript, all citations to exhibits refer to page numbers generated by the Court's Electronic Case Filing ("ECF") system.

Plaintiff, however, did not modify, refinance or pay off the mortgage, nor did he vacate the premises by the October 5, 2023 deadline.  (Ds' 56.1 Stmt. ¶¶ 13-14.)[6]  On February 7, 2024, Justice James L. Hyer of the Westchester County Supreme Court ordered that Plaintiff be forcibly removed from the premises pursuant to the settlement agreement.  (*Id.* ¶¶ 15-17.)  The order also prohibited the condominium's Homeowners Association and management company from interfering with law enforcement's removal of Plaintiff from the premises or preventing Eastman from accessing the premises.  (*Id.* ¶ 17.)  After receiving the order in court, Plaintiff went to the Westchester County Sheriff's Office, which referred him to the New Rochelle City Marshal's Office.  (*Id.* ¶ 18.)  Plaintiff spoke with Marshal Wil Ortiz, who told Plaintiff that he was unfamiliar with the case, as it was not yet on his docket.  (*Id.* ¶ 19.)

On March 1, 2024, Ortiz placed a notice on Plaintiff's door notifying him that he had until 9:30 a.m. on March 4, 2024 to vacate the premises and that all personal belongings left inside the apartment would be removed.  (*Id.* ¶¶ 21-22.)  At that time, Plaintiff was still living at the premises in contravention of Justice Hyer's order.  (*Id.* ¶ 23.)  After receiving the notice from Ortiz on March 1, Plaintiff electronically filed an order to show cause attempting to challenge the eviction order, but the Supreme Court denied his application.  (*Id.* ¶¶ 25-26.)

By March 3, 2024, Plaintiff had removed all of his belongings from the apartment except for a hotel cart full of items.  (*Id.* ¶ 29.)  That day, Plaintiff spoke to a member of the board of the

---

[6] I take judicial notice of the fact that Plaintiff filed for Chapter 13 bankruptcy on October 5, 2023.  *See* Chapter 13 Voluntary Petition for Individual, *In re Mongiello*, No. 23-BK-22732 (Bankr. S.D.N.Y.), Dkt. No. 1.  The automatic stay was lifted on January 19, 2024.  *See* Order Granting Motion for Relief from Stay, *In re Mongiello*, No. 23-BK-22732 (Bankr. S.D.N.Y.), Dkt. No. 43.  The bankruptcy case was closed on April 1, 2025, *see In re Mongiello*, No. 23-BK-22732 (Bankr. S.D.N.Y.), Dkt. Entry dated Apr. 1, 2025, after unsuccessful appeals to this Court, *see In re Mongiello*, No. 24-CV-694 (S.D.N.Y. 2024); *In re Mongiello*, No. 24-CV-2468 (S.D.N.Y. 2024); *In re Mongiello*, No. 24-CV-2548 (S.D.N.Y. 2024).

condominium, Robert Viner.  (*Id.* ¶ 30.)  Viner suggested to Plaintiff that the Marshals could not enter the apartment building because the building was not a party to the action between Plaintiff and Eastman and had not received Justice Hyer's order.  (*Id.*)  This conversation led Plaintiff to believe that while the order authorized the Marshal to evict him from his unit, the Marshal would not be able to enter the building.  (*Id.* ¶ 31.)  According to Defendants, the condominium board, building superintendent and building concierge were all aware that Ortiz would be effectuating the warrant on the morning of March 4, 2024.  (*Id.* ¶ 33.)  According to Plaintiff, however, both his doorman and Ortiz led him to believe that he would have two more weeks to evacuate the apartment.  (P's 56.1 Resp. at 7-8 ¶ 1.)[7]

On March 4, 2024, when Ortiz arrived to execute the court order, Plaintiff was waiting outside with the superintendent.  (Ds' 56.1 Stmt. ¶ 34.)  By this time, a locksmith had already arrived.  (*Id.* ¶ 32.)   Plaintiff approached Ortiz and told him that he lacked authority to enter the building.  (*Id.* ¶ 35.)  Plaintiff claims that even though he was already outside and no longer occupying the unit, Ortiz shoved him to "push[] [him] out of the way," (P's Depo. at 115:23-25), before attempting to enter the building, (P's 56.1 Resp. at 8 ¶ 4).  Plaintiff also claims that "[v]ideo evidence shows th[at Ortiz] brandished his weapon and struck Plaintiff with the door," (*id.* at 8 ¶ 5),[8] causing him to sustain "bruised ribs and physical pain,"[9] (*id.* at 11 ¶ 10).  He

---

[7] Although Plaintiff's 56.1 Response responds to the numbered paragraphs in Defendants' 56.1 Statement until ¶ 31 on page 7, it then restarts at ¶ 1.  It later reverts to tracking Defendants' paragraph numbering on page 11 at ¶ 46.  The Court will thus reference both the page number and the paragraph for all responses following ¶ 31 on page 7 until ¶ 46 on page 11.

[8] Plaintiff further contends that this conduct "prompt[ed] the locksmith to call 911 believing lethal harm was imminent."  (P's 56.1 Resp. at 8 ¶ 5.)  No recording or transcript of this call, or any evidence from the locksmith, has been provided.

[9] Although Plaintiff's 56.1 Response indicates that the bruising was to his rib, Plaintiff testified at his deposition that the bruise was on his shoulder.  (*See* P's Depo. at 127:6-128:2.)

further accuses Ortiz of saying, "I am going to kill you bro," and claims that the concierge had to "step in and restrain" Ortiz from "killing" Plaintiff.  (*Id.* at 8-9 ¶¶ 4-5.)  It is undisputed, however, that Plaintiff attempted to block the door of the building with his body to prevent Ortiz from entering, (*see* Ds' 56.1 Stmt. ¶ 37; P's Depo. at 115:3-8), and Defendants claim that Ortiz only used minimal force to move Plaintiff out of the way and gain entry to the building after telling Plaintiff that he had an eviction warrant and that Plaintiff should take any dispute about it to the court, (Ds' 56.1 Stmt. ¶¶ 36-40).  Defendants deny that Ortiz ever touched his gun, let alone brandished it.  (*Id.* ¶ 41.)  Defendants also deny that Plaintiff sustained any injuries.  (*Id.* ¶ 42.)  Plaintiff concedes that he did not seek medical treatment after the incident, and he did not photograph the bruise he claims to have sustained because he "didn't think anything of it."  (P's Depo. at 127:13-22; Ds' 56.1 Stmt. ¶¶ 47-49; P's 56.1 Resp. ¶ 49.)

Police officers arrived and instructed Plaintiff to return to his unit and collect his remaining belongings, which he did.  (Ds' 56.1 Stmt. ¶¶ 43, 45; P's 56.1 Resp. at 11 ¶ 11.) Eastman, now the owner of the unit, told the police that she was supposed to take possession that day.  (Ds' 56.1 Stmt. ¶ 44.)  Plaintiff contends that a member of the condominium board called 911 claiming that Ortiz and the police officers accompanying him did not have authorization to enter the building and were therefore trespassing.  (P's 56.1 Resp. ¶ 24.)[10]

---

Either way, it is undisputed that any bruising had healed within a week and a half or so of the incident.  (*See id.* at 127:23-24; Ds' 56.1 Stmt. ¶ 48; *see also* P's 56.1 Resp. ¶ 48 (arguing that "[t]he bruise Plaintiff sustained is evidence of a physical touching" but not denying that the alleged bruising on his shoulder resolved within a week and a half).)

[10] Plaintiff provides what appears to be a typewritten transcription of the alleged 911 call from the board member, (ECF No. 71-2 at 15-16), but without any verification as to its origin or accuracy.  No recording, or evidence from the alleged caller, is provided.

Defendants claim that Plaintiff had changed the locks, (Ds' 56.1 Stmt. ¶ 44), but Plaintiff denies having done so, (P's 56.1 Resp. at 11 ¶ 12).  After the eviction, the City's Corporation Counsel reviewed the video footage of the incident and commended Ortiz for his handling of the situation.  (Ds' 56.1 Stmt. ¶ 46.)

### B.    Procedural History

On June 21, 2024, Plaintiff filed his complaint.  (ECF No. 1.)  The complaint itself contained few factual allegations, but it attached a transcript of Plaintiff's examination under oath pursuant to Section 50-h of the General Municipal Law, during which Plaintiff recounted his version of many of the above-described events.  (*Id.*)  Defendants filed an Answer on August 20, 2024, (ECF No. 14), and on September 26, 2024, the Court held an initial conference, (*see* Minute Entry dated Sept. 26, 2024), and issued a scheduling order, (ECF No. 18).  The case was referred to Magistrate Judge Judith C. McCarthy for general pretrial purposes.  (ECF No. 24.)

During discovery, Plaintiff filed several letters accusing Defendants of withholding discovery or committing similar misconduct, (*see* ECF Nos. 23, 33, 43, 45), and expressly sought sanctions on at least one occasion, (ECF No. 45), a request which Judge McCarthy denied, (*see* Minute Entry dated May 15, 2025).  Judge McCarthy certified discovery as complete on July 28, 2025.  (ECF No. 49.)  On August 21, 2025, Defendants filed a letter outlining the grounds for their proposed motion for summary judgment.  (ECF No. 52.)  The Court held a conference on September 4, 2025, during which the parties discussed Defendants' proposed motion and Plaintiff informed the Court that he wished to file a cross-motion for sanctions based on alleged witness tampering.  (*See* Minute Entry dated Sept. 4, 2025.)  The Court set a briefing schedule for both motions.  (*See id.*)

On October 7, 2025, Defendants filed their motion for summary judgment.  (ECF No. 55.)  On October 28, 2025, Plaintiff filed his cross-motion, entitled "Plaintiff's Motion to find Defendant Will Ortiz Guilty of Witness Tampering, Discovery Abuse, Sanctions, Terminating Sanctions, and/or Directed Summary Judgment."  (ECF No. 62 ("P's Cross Mot.").)[11]  Plaintiff then filed a letter on November 3, 2025 purporting to "supplement" his motion.  (ECF No. 64 ("P's Supp. Letter").)  While noting that it was improper for Plaintiff to attempt to "evade filing deadlines by filing 'supplements' to motions," the Court nonetheless advised Defendants that it would consider Plaintiff's supplemental submission in deciding the instant motion.  (ECF No. 65.)  Defendants filed their opposition to Plaintiff's cross-motion on November 10, 2025, (ECF No. 66), and on November 26, 2025, Plaintiff filed a reply in further support of his motion, (ECF No. 68).

On November 12, 2025, Plaintiff filed his response to Defendants' 56.1 Statement and his memorandum of law in opposition to the Defendants' motion.  (ECF No. 67.)[12]  The end of the document includes a list of exhibits, which were not attached to or filed with the document.  (*Id.* at 43-44.)  On December 1, 2025, Plaintiff filed a letter attaching fifty-five pages of exhibits and indicating that they had not been docketed because the file was malformed.  (ECF No. 69.)  Plaintiff filed a similar letter on December 15, 2025, attaching 388 pages of exhibits that he stated "belong[ed] to docket #68," (ECF No. 70), which is his reply in support of his motion.  He

---

[11] The deadline for Plaintiff's cross-motion was October 27, 2025, (*see* ECF No. 61), but given Plaintiff's claim that he had timely emailed it to the *Pro Se* Department for filing, (*see* ECF No. 63), and in light of his *pro se* status, the Court will address the motion on the merits.

[12] Plaintiff filed his 56.1 Response and his opposition brief as a single document.  (ECF No. 67.)  The Court refers to the first thirteen pages of the document containing his 56.1 Response as "P's 56.1 Resp.," and the remainder of the document (pages fourteen through forty-five) as "P's Opp."

filed yet another letter on January 6, 2026, again claiming that his earlier filing was incomplete

due to a malformed submission and attaching ninety-eight pages of exhibits, this time noting that

"these exhibits belong to docket #70."  (ECF No. 71.)[13]

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

---

[13] Although the Court has reviewed Plaintiff's untimely submissions in light of his *pro se* status, none of Plaintiff's exhibits help his case.

First, the majority of Plaintiff's exhibits, including deposition transcripts, the eviction order and notice, and the police report from the day of the incident, were already submitted by Defendants.  Those exhibits that were not already submitted by Defendants – which include various emails from Plaintiff to third parties, as well as the unverified transcription of the alleged 911 call from the board member – would not create a genuine dispute of fact even if they were admissible.

Moreover, Plaintiff cites to only two of these exhibits in his 56.1 Response and Opposition.  (*See* P's 56.1 Resp. ¶¶ 24, 27-28, 31 (citing Exhibit E); P's Opp. at 37 (citing Exhibit J).)  And because Plaintiff's exhibit list, (P's Opp. at 43-44), does not correspond with the subsequently filed exhibits (*see* ECF Nos. 69-71) – and does not even appear to align with the citations in his memorandum, (*compare* P's 56.1 Resp. ¶ 24 (citing "Exhibit E" after discussing condominium board's alleged 911 call), *and id.* ¶ 28 (appearing to identify "Exhibit E" as the order authorizing his eviction), *with* P's Opp. at 43 (defining "Ex. E" as "Ortiz deposition excerpts re: lack of records search/training knowledge")) – it is unclear how Plaintiff thinks these exhibits advance his arguments.  In any event, it appears from context that Exhibit E is meant to be the unverified 911 call that Plaintiff appears to cite for the caller's irrelevant views on the law of trespass, and while there is no Exhibit J attached to any of Plaintiff's papers, it appears from context that Exhibit J is meant to refer to an email Plaintiff sent on March 5, 2024, apparently to members of the condominium board, (ECF No. 70-6 at 29-30), which appears to be an apology for not following condominium rules regarding his move, does not mention the encounter with Defendant Ortiz on March 4, and is in any event hearsay.

counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and

supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

In addition, *pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). But "[a] *pro se* party's bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Walker v. Vaughan*, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002).

## III.    DISCUSSION

### A.    Defendants' Motion for Summary Judgment Is Granted

Analyzing an excessive force claim under the Fourth Amendment "requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Linton v. Zorn*, 135 F.4th 19, 31 (2d Cir. 2025), *rev'd on other grounds by Zorn v. Linton*, 146 S. Ct. 926 (2026) (*per curiam*).[14] "In deciding whether or not the amount of force used is reasonable, [courts] must

---

[14] As a threshold matter, it is not entirely clear to the Court that the Fourth Amendment even applies to Plaintiff's claims here. As Defendants acknowledge in their brief, the Fourth Amendment governs claims of excessive force "'in the course of an arrest, investigatory stop, or other "seizure" of a free citizen.'" (ECF No. 58 ("Ds' Mem.") at 2 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989).) It is not clear what the purported "seizure" here is, as Plaintiff was never detained; to the contrary, it appears that Marshal Ortiz wanted Plaintiff out of the way. Nor does Plaintiff's claim that Marshal Ortiz pushed him render the incident here a seizure, as courts in the Second Circuit have held that "an officer's push [is] not a Fourth Amendment seizure, even where the individual was knocked over." *Malave v. Austin*, No. 19-CV-5534, 2021 WL 3603433, at *3 (E.D.N.Y. Aug. 13, 2021) (collecting cases). Thus, it appears Plaintiff's claim may be more appropriately analyzed under the Due Process Clause of the Fourteenth Amendment, which governs claims "in the 'non-seizure, non-prisoner context.'" *Bogart v. City of N.Y.*, No. 13-CV-1017, 2016 WL 4939075, at *7 (S.D.N.Y. Sept. 6, 2016). While some courts hold that the same standard applies under both provisions, *see Hall v. Suffolk Cnty. Corr. Facility*, No. 20-CV-2809, 2022 WL 20085974, at *7 (E.D.N.Y. July 19, 2022) ("Fourth and Fourteenth Amendment excessive force claims are judged by the same standard, which examines

consider the totality of the circumstances faced by the officer on the scene." *Rincon v. City of N.Y.*, No. 03-CV-8276, 2005 WL 646080, at *4 (S.D.N.Y. Mar. 21, 2005).  "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Ifudu v. City of N.Y.*, No. 16-CV-2957, 2018 WL 4568799, at *9 (E.D.N.Y. Sept. 24, 2018).

Plaintiff argues that Ortiz did not need to use any force whatsoever to evict him because he was already "outside of the building, so there was no one inside to evict."  (P's Opp. at 18.)  But the fact that Plaintiff was outside did not mean that Ortiz no longer needed to enter the building to carry out the eviction order, which required him to take possession of the unit and remove any remaining personal property.  (*See* Eviction Order.)  The suggestion that Ortiz should have abandoned his task because Plaintiff was outside the building at the moment of Ortiz's arrival is absurd, as that would leave Plaintiff free to return to the apartment and would do nothing to secure it for its rightful owner.  Plaintiff's argument that Ortiz could have "achieve[d] peaceful entry" without using force because he had "concierge access" and a "key fob," (P's Opp. at 18), is also meritless – neither of these modes of access were available given that Plaintiff was blocking the door with his body.

---

whether the force was objectively unreasonable in light of the facts and circumstances of each particular case."), others suggest that the Fourteenth Amendment test is more stringent (i.e., more defendant-friendly), *see Williams v. Norris*, No. 18-CV-349, 2021 WL 2894856, at *10 (N.D.N.Y. July 9, 2021) (Fourth Amendment requires that the force was objectively excessive or unreasonable and Fourteenth Amendment requires purposeful, knowing or perhaps reckless use of objectively unreasonable force); *Bogart*, 2016 WL 4939075, at *7 (S.D.N.Y. Sept. 6, 2016) ("Excessive force claims asserted in the non-seizure, non-prisoner context are analyzed under the Due Process Clause of the Fourteenth Amendment using a more stringent 'shocks the conscience' standard.").  As Defendants are entitled to summary judgment either way, I analyze the arguably more plaintiff-friendly Fourth Amendment standard.

To counter Defendants' argument that Oritz was acting pursuant to a lawful eviction order, Plaintiff repeatedly characterizes the order as invalid "because the condominium association/management were never served or made parties." (P's Opp. at 14; *see* P's 56.1 Resp. ¶¶ 15-17, 23, 27-28.)  But the Eviction Order did not purport to enjoin or bind the condominium association or management company; it merely provided that they were to refrain from interfering with the execution of the order.  (*See* Eviction Order.)[15]  Plaintiff provides no

---

[15] Plaintiff claims that one member of the board took issue with law enforcement entering the building and called 911 to accuse the officers of "trespassing." (P's 56.1 Resp. ¶ 24.)  But even assuming that Plaintiff has accurately transcribed the 911 call in his response – which the Court has no way of determining, given that Plaintiff has neither explained how he obtained this transcription nor certified its accuracy – under New York law "law-enforcement officials have a privilege to enter private property to perform their legal duties." *Reynolds v. United States*, 927 F. Supp. 91, 96 (W.D.N.Y. 1996); *see Simmons v. Casella*, No. 14-CV-4491, 2021 WL 11629835, at *9 (E.D.N.Y. Aug. 31, 2021), *report and recommendation adopted* (E.D.N.Y. Sept. 28, 2021).  Thus, one board member's purported disagreement with the way the eviction was carried out does not suggest that the eviction order was unlawful or that Ortiz behaved improperly.  This is especially true in light of the testimony of the superintendent and his daughter, which demonstrates not only that the superintendent, the concierge, and members of the board were aware that the Marshal would be coming that day to evict Plaintiff, (ECF No. 57-6 ("E. Lizardo Depo.") at 7:21-8:11; ECF No. 57-7 ("G. Lizardo Depo.") at 10:9-17), but also that Eastman, as the new owner of the unit, (*see* Ds' 56.1 Stmt. ¶ 44), could authorize the Marshal to enter the building's lobby, (E. Lizardo Depo. at 7:5-13).

And even assuming for the sake of argument that the order was somehow jurisdictionally deficient, "[i]t is not within the scope of a sheriff's authority to review or question the legality of a court mandate," and Ortiz would thus be immune from any liability for carrying out the court's order. *Tomassi v. Sheehan*, No. 15-CV-3605, 2016 WL 4768826, at *8 (E.D.N.Y. Aug. 23, 2016), *report and recommendation adopted*, 2016 WL 4767539 (E.D.N.Y. Sept. 13, 2016); *see Kelly v. Graf*, No. 24-CV-6793, 2026 WL 111675, at *5 (E.D.N.Y. Jan. 15, 2026) ("[A] court officer who properly executes a facially valid court order has no obligation to independently research its validity; in fact, he has no authority to question its legality."); *Harley v. Guida*, No. 19-CV-6152, 2022 WL 4539510, at *4 (E.D.N.Y. Sept. 28, 2022) (officer has no obligation to independently investigate validity of facially valid warrant).  Although it is less clear whether quasi-judicial immunity would shield Ortiz from allegations of excessive force in carrying out the order, *see Patterson v. Jenkins*, No. 25-CV-1438, 2026 WL 370289, at *4 (S.D.N.Y. Feb. 10, 2026); *Bey ex rel. Palmgren v. Conte*, No. 18-CV-9594, 2019 WL 1745672, at *3 (S.D.N.Y. Apr. 18, 2019), the Court need not decide this issue given that there is no evidence that the force used here was excessive, as discussed in the text.

authority for the startling proposition that it would be appropriate for a third party to hinder the execution of a court order.  Moreover, even if the eviction was procedurally improper as to the condominium association or management company – which the record does not establish – that has no bearing on whether the order was binding as to Plaintiff.  Indeed, Plaintiff does not contest that Ortiz had the right to evict him.  (P's Depo. at 89:19-21.)  Thus, because Plaintiff was physically blocking Ortiz from carrying out the eviction order, Ortiz was justified in using force to move Plaintiff out of the way.

With regard to the level of force used, the Court first notes that the video of the incident taken from the lobby, (ECF No. 57-11 ("Security Video")), undermines Plaintiff's version of events.  For example, Plaintiff insists that the video "supports that Ortiz shoved Plaintiff and door-struck his ribs." (P's Opp. at 18.)  The footage, however, shows Ortiz struggling to open the door against Plaintiff's weight, and the only portion of the video where it appears that Plaintiff may have been hit by the door seems to be when Ortiz and Plaintiff both had their hands on the door handle and Ortiz momentarily is able to open the door a few inches before Plaintiff pushes it closed.  (*See* Security Video.)  In other words, the video does not show Ortiz intentionally hitting Plaintiff with the door while Plaintiff was standing off to the side – rather, it appears that any contact the door made with Plaintiff's body resulted from the struggle between Ortiz trying to open the door and Plaintiff trying to force it closed.  Once the door is open, the video shows Plaintiff trying to push Ortiz away from it, and the only action by Ortiz that could be characterized as a "shove" is where Ortiz pushes back against Plaintiff to pass through.  (*See id.*)  Plaintiff also claims that the video shows Ortiz brandishing his weapon, (P's 56.1 Resp. at 8-9 ¶ 5; *see* P's Opp. at 15), but, as Plaintiff admitted during his deposition, (P's Depo. at 117:4-

14

20), the video shows no such thing, (*see* Security Video).[16]  Where a party's version of events is "blatantly contradicted" by video footage, the Court is not required to ignore the video evidence and accept the party's testimony as true.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Benitez v. Healy*, No. 15-CV-1179, 2017 WL 9673721, at *5 (N.D.N.Y. June 7, 2017), *report and recommendation adopted*, 2018 WL 1444218 (N.D.N.Y. Mar. 22, 2018); *Cousin v. White Castle Sys., Inc.*, No. 06-CV-6335, 2009 WL 1955555, at *5 (E.D.N.Y. July 6, 2009).

Even by Plaintiff's account, however, no reasonable jury could find that the force Ortiz used was excessive.  With respect to the alleged shove and Ortiz's hitting Plaintiff with the door, these actions were objectively reasonable in light of the undisputed fact that Plaintiff was standing in Ortiz's way and trying to prevent Ortiz from entering the building.  (*See* Ds' 56.1 Stmt. ¶¶ 37, 39; P's Depo. at 115:3-8, 23-25; 116:7-14.)  Ortiz was acting pursuant to a court order directing that Plaintiff be removed from the premises "by any means necessary," (Eviction Order at 5; Ds' 56.1 Stmt. ¶¶ 17, 34), and he could not execute that order without using a measure of force to counteract Plaintiff's attempts to impede him from doing so, *cf. Petway v. City of N.Y.*, No. 12-CV-279, 2014 WL 839931, at *8 (E.D.N.Y. Mar. 4, 2014) (no excessive force where officer shoved plaintiff out of the way at the scene of arrest); *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 594 (W.D.N.Y. 2014) (same); *DiGennaro v. Town of Gates Police Dep't*, No. 07-CV-6426, 2013 WL 3097066, at *13 (W.D.N.Y. June 18, 2013) (no unreasonable use of force where law enforcement pulled individual down the stairs after he attempted to impede officers from executing arrest warrant by blocking doorway with his body).  And Plaintiff's claimed injury – a bruise that resolved in under two weeks – further demonstrates that any force

---

[16] Witnesses from the scene also deny that Ortiz ever took out his weapon.  (*See* E. Lizardo Depo. at 10:4-7; G. Lizardo Depo. at 14:10-12; ECF No. 57-8 ("Melecio Depo.") at 10:14-11:2.)

used by Ortiz was *de minimis*.  *See Westry v. Ahearn*, No. 22-CV-686, 2026 WL 608287, at \*6 (D. Conn. Mar. 4, 2026) (although plaintiff does not need to allege serious injury to prevail on excessive force claim so long as force used was unreasonable, "*de minimis* injury might be evidence that an officer did not use excessive force"), *appeal filed*, No. 26-688 (2d Cir. Mar. 20, 2026); *Ferebee v. City of N.Y.*, No. 15-CV-1868, 2017 WL 2930587, at \*8 (S.D.N.Y. July 6, 2017) ("A *de minimis* use of force will rarely suffice to state a constitutional claim, and *de minimis* injury can serve as conclusive evidence that *de minimis* force was used."), *reconsideration denied*, 2017 WL 3208602 (S.D.N.Y. July 27, 2017).

Nor do Plaintiff's claims that Ortiz brandished his weapon[17] and threatened him, (P's 56.1 Resp. at 8 ¶¶ 4-5), establish excessive force.  "As courts in this circuit have invariably held, threats of force, including the drawing of a gun, cannot constitute excessive force as a matter of law." *Pierre v. City of N.Y.*, 531 F. Supp. 3d 620, 627 (E.D.N.Y. 2021); *see Cabral v. City of N.Y.*, No. 12-CV-4659, 2014 WL 4636433, at \*11 (S.D.N.Y. Sept. 17, 2014) (collecting cases), *adhered to*, 2015 WL 4750675 (S.D.N.Y. Aug. 11, 2015), *and aff'd*, 662 F. App'x 11 (2d Cir. 2016) (summary order); *see also Graham v. Ferretti*, No. 14-CV-5815, 2022 WL 20472223, at \*13 (E.D.N.Y. Aug. 5, 2022) (rejecting excessive force claim based on allegation that defendant threatened to kill plaintiff because "verbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983").

---

[17] By the time of his deposition, Plaintiff's version of events had changed to Ortiz unclipping his holster and putting his hand on his gun.  (*See* P's Depo. at 116:25-117:3.)

Because Plaintiff has presented no evidence from which a reasonable jury could conclude that Ortiz's use of force was unreasonable, Defendants' motion is granted as to the excessive force claim.[18]  Further, because "the elements of a Section 1983 excessive force claim and New York law assault and battery claims are substantially identical," *Palmer v. City of N.Y.*, 564 F. Supp. 3d 221, 247 n.1 (E.D.N.Y. 2021); *see Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398 (S.D.N.Y. 2013) ("[T]he test for whether a plaintiff can maintain state law assault and battery causes of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim."), Plaintiff's state law assault and battery claims are dismissed on the same grounds.[19]

My finding that Plaintiff's constitutional claim fails also dooms his *Monell* claim against the City, as "[t]here can be no *Monell* liability absent an underlying constitutional violation." *Green v. City of Mount Vernon*, No. 22-CV-8554, 2024 WL 710191, at *2 (S.D.N.Y. Feb. 21,

---

[18] Because Plaintiff's excessive force claim fails on the merits, I need not address Defendants' argument that Ortiz is entitled to qualified immunity.  *See Close v. Bedford Cent. Sch. Dist.*, No. 23-CV-4595, 2024 WL 3427213, at *14 n.23 (S.D.N.Y. July 16, 2024); *Grace v. Alvarado*, No. 21-CV-3578, 2024 WL 1859851, at *8 n.3 (S.D.N.Y. Apr. 29, 2024).

[19] Plaintiff's opposition also refers to an "IIED" claim.  (*See* P's Opp. at 22.)  His complaint contains no claim for intentional infliction of emotional distress, and this fact alone entitles the Court to disregard it.  *See Bus. Watchdog v. ITEX Corp.*, No. 13-CV-6794, 2014 WL 5525718, at *12 (S.D.N.Y. Oct. 29, 2014) ("A plaintiff[, ]even one proceeding *pro se* – may not amend a pleading by asserting a new claim in a brief, so I will simply ignore this claim.").  But even if Plaintiff had asserted an IIED claim in his complaint, it would be dismissed as duplicative because it is based on the same conduct as Plaintiff's excessive force and assault and battery claims.  *See Centeno v. City of N.Y.*, No. 16-CV-2393, 2019 WL 1382093, at *10 (S.D.N.Y. Mar. 27, 2019); *Blot v. Town of Colonie*, No. 14-CV-991, 2017 WL 61943, at *21 (N.D.N.Y. Jan. 5, 2017).  Finally, because the undisputed evidence shows that Ortiz's use of force was a reasonable response to Plaintiff's obstruction, no reasonable juror could find that Ortiz engaged in the sort of extreme and outrageous conduct required to establish an IIED claim under New York law.  *See Taylor v. City of Rochester*, 458 F. Supp. 3d 133, 145 (W.D.N.Y. 2020); *Bruker v. City of N.Y.*, 337 F. Supp. 2d 539, 560 (S.D.N.Y. 2004).

2024) (collecting cases); *see McKay v. Vill. of Spring Valley*, No. 12-CV-3077, 2013 WL 5745923, at *4 (S.D.N.Y. Oct. 23, 2013).

Finally, Plaintiff's claims against the Office of the City Marshal are also dismissed on the ground that "[u]nder New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Walker v. U.S. Marshals*, No. 08-CV-959, 2009 WL 261527, at *2 (E.D.N.Y. Feb. 4, 2009); *see Long v. County of Orleans*, 540 F. Supp. 3d 344, 350 (W.D.N.Y. 2021).

Defendants' motion is thus granted in full.

### B.      Plaintiff's Cross-Motion Is Denied

In addition to opposing Defendants' motion for summary judgment, Plaintiff moves for sanctions on the grounds that Defendants tampered with witnesses by intimidating them into changing their testimony and "fail[ed] to do any diligent search for information prior to answering the written discovery." (P's Cross Mot. at 1-2.) This motion is meritless.

Beginning with Plaintiff's accusations of witness tampering, "courts have held that witness tampering is sanctionable under a court's inherent power." *Perez v. Metro Dairy Corp.*, No. 13-CV-2109, 2016 WL 755628, at *4 (E.D.N.Y. Feb. 25, 2016); *Harris v. SCA Rest. Corp.*, No. 09-CV-2212, 2014 WL 996249, at *4 (E.D.N.Y. Mar. 14, 2014). But "inherent powers must be exercised with restraint and discretion," and "[s]anctionable conduct must be proven by clear and convincing evidence." *Perez*, 2016 WL 755628, at *4; *see Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188, 2022 WL 3646205, at *1 (S.D.N.Y. Aug. 24, 2022) ("[C]lear and convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power.").

18

Plaintiff has provided no evidence whatsoever, let alone clear and convincing evidence, that Defendants engaged in any improper conduct.  The only support he provides for his accusation of witness tampering is Ortiz's statement that he (Ortiz) may have seen some of the individuals who were present for the eviction "in passing" after the incident, and the fact that certain of these individuals then testified in a way that harmed Plaintiff's case.  (*See* P's Cross Mot. at 25-31.)  First, Ortiz's statement that he has "seen some [of the individuals present for the eviction] in passing, but nothing substantial for [him] to remember," (ECF No. 57-5 ("Ortiz Depo.") at 29:19-20), by no means even suggests that he threatened, intimidated or otherwise coerced any witness to testify in a particular way.  Nor does it suggest, as Plaintiff contends, that Ortiz "personally visited the condominium premises and met with each witness," (P's Cross Mot. at 2), a contention for which Plaintiff offers no support.  No witness testified to subsequent conversations with Ortiz – in fact, the two witnesses asked about whether they had discussed the case with Ortiz said that they had not.  (*See* G. Lizardo Depo. at 16:21-17:5; Melecio Depo. at 8:25-9:6.)  And the record indicates that Ortiz was responsible for other evictions in both Plaintiff's building and other buildings in the area, which would explain why he may have seen some of these witnesses in passing.  (*See* G. Lizardo Depo. at 16:23-17:5; Melecio Depo. at 8:16-24.)

Second, while Plaintiff appears to contend that witnesses' deposition testimony was inconsistent with what they had told him in prior conversations, his motion does not specifically recount any statements that conflicted with the testimony in any meaningful way, let alone present any admissible evidence of these statements.  *See In re Pishevar*, No. 19-MC-503, 2020 WL 8299764, at *4 (S.D.N.Y. Oct. 3, 2020) ("[S]tatements made by laypersons in unsworn contexts may differ from statements made under oath.  Moreover, two persons to a conversation

may have different recollections of what they said to one another. Nonetheless, any inconsistencies between sworn and unsworn statements do not render the sworn statements untrue."). Rather, Plaintiff extensively quotes portions of witnesses' testimony that is unfavorable to him and simply labels these statements "Lie[s]." (*See* P's Cross Mot. at 25-31.)[20] Because there is simply no evidence of witness tampering outside of Plaintiff's pure speculation and mischaracterization of testimony, his motion for sanctions on this ground is denied. *See Greer v. Mehiel*, No. 15-CV-6119, 2018 WL 1626345, at *8 (S.D.N.Y. Mar. 29, 2018) (denying request for sanctions where "Plaintiff's contention that the [Defendants] engaged in witness tampering [wa]s mere speculation and lack[ed] any evidentiary support"), *aff'd*, 805 F. App'x 25 (2d Cir. 2020) (summary order); *Jackson v. Nassau County*, No. 18-CV-3007, 2024 WL 4252047, at *25 (E.D.N.Y. Sept. 20, 2024) (rejecting accusation of witness tampering because "it is Plaintiff's burden to present evidence in the record of the alleged fabrication; Plaintiff may not stand on his own speculation"); *Fappiano v. City of N.Y.*, No. 01-CV-2476, 2015 WL 94190, at *18 (E.D.N.Y. Jan. 7, 2015) (plaintiff could not create a genuine dispute of fact based on

---

[20] Indeed, the only purported "contradictions" Plaintiff actually raises are (1) a witness's statement that the concierge desk was on the right despite her prior description of it being on the left; and (2) that witness's statement that two board members were present despite her "prior account that no board members were there." (P's Cross Mot. at 28.) But even assuming that these prior statements were made, the details recounted in these statements have no bearing on Plaintiff's claim of excessive force, and it defies logic to suggest that Ortiz would have threatened witnesses to change testimony regarding irrelevant details. And while Plaintiff also insists that a witness's testimony that she did not see Ortiz "pull his gun out" conflicted with her "prior shocked reaction" during the incident, (*id.*), there is nothing to suggest that a "shocked reaction" is inconsistent with this testimony. Indeed, when Plaintiff was asked during his deposition how he knew that the witness's reaction was not a response to Plaintiff's obstruction as opposed to Ortiz's conduct, Plaintiff had no meaningful response. (*See* P's Depo. at 118:25-119:9.) And while Plaintiff asserted in his deposition that the three eyewitnesses were lying when they denied under oath that Ortiz had touched his gun, claiming that they had all previously told him that they had seen it, (*see id.* at 118:12-24), he did not claim that anybody had ever said that Ortiz had pulled his gun out.

speculation of witness tampering by "pil[ing] impermissible inference upon impermissible inference"), *aff'd*, 640 F. App'x 115 (2d Cir. 2016) (summary order).[21]

As to Plaintiff's contentions regarding Defendants' purported discovery failures, his motion fails to the extent that he seeks to sanction conduct already raised in the sanctions motion that Judge McCarthy denied, (*see* ECF No. 45; Minute Entry dated May 15, 2025), as well as to the extent that it seeks to sanction Defendants for withholding documents that Judge McCarthy ruled they did not need to provide, (*see* Minute Entry dated Dec. 11, 2024; ECF No. 35; Minute Entry dated Jan. 22, 2025; ECF No. 41; Minute Entry dated Feb. 21, 2025; Minute Entry dated Mar. 21, 2025). *See United States v. Schwartz*, No. 18-CV-1583, 2022 WL 3703953, at *2 (E.D.N.Y. Aug. 25, 2022) (rejecting attempt to relitigate discovery issue already decided by magistrate judge); *Stryker v. HSBC Sec. (USA)*, No. 16-CV-9424, 2020 WL 5127461, at *18 (S.D.N.Y. Aug. 31, 2020) (same); *Charity Grp., LLC v. Absolut Spirits Co.*, No. 08-CV-11020, 2010 WL 11594986, at *6 n.2 (S.D.N.Y. June 29, 2010) (relying on law-of-the-case doctrine to deny request to reopen discovery ruling by magistrate judge). Not having objected to any of these nondispositive rulings of the Magistrate Judge, Plaintiff is hardly in a position to now ask this Court to find the underlying conduct sanctionable. *Cf.* Fed. R. Civ. P. 72(a) ("A party may not assign as error a defect in the [nondispositive] order not timely objected to.").

---

[21] At the September 4, 2025 conference, the Court warned Plaintiff that his cross-motion would need to comply with Federal Rule of Civil Procedure 11 and, in particular, that that rule prohibits litigants from filing claims based on speculation. "It is well-settled that Rule 11 applies to *pro se* litigants," and "one acting *pro se* has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets." *Hubbuch v. Capital One, N.A.*, No. 25-CV-406, 2026 WL 691261, at *25 (S.D.N.Y. Feb. 10, 2026); *see Tripathy v. Schneider*, No. 21-CV-6339, 2024 WL 4528763, at *2 (W.D.N.Y. Oct. 18, 2024). Although the Court declines to impose sanctions on its own motion in light of the lenient standards that apply to *pro se* litigants, *see Tripathy*, 2024 WL 4528763, at *4, Plaintiff is cautioned that filing frivolous claims or actions could well subject him to sanctions in the future.

Plaintiff's primary arguments as to Defendants' alleged discovery abuses, however, appear to relate to Ortiz's deposition, which took place after Judge McCarthy denied the prior sanctions motion.  (*See* Ortiz Depo. at 1; Minute Entry dated May 15, 2025.)  Specifically, Plaintiff argues that (1) Ortiz's testimony suggests that certain of Defendants' discovery responses were untruthful, (*see* P's Supp. Letter at 3-14); and (2) Ortiz's inability to answer certain questions relating to Defendants' interrogatory responses indicates that Defendants failed to conduct a thorough investigation before providing these responses, (*id.* at 15-17; P's Cross Mot. at 3-11, 31-34).

As to the first argument, even if Ortiz's testimony had conflicted with certain of the Defendants' responses to some extent, a minor contradiction would not establish that Defendants failed to conduct a reasonable inquiry.  *See Diaz v. Loc. 338 of the Retail, Wholesale, Dep't Store Union, United Food & Com. Workers*, No. 13-CV-7187, 2015 WL 5158487, at *6 (E.D.N.Y. May 15, 2015) (contradiction between Union's discovery responses and testimony of Union President and Union Director did not indicate that Union had failed to conduct a reasonable inquiry in preparing discovery responses), *report and recommendation adopted*, 2015 WL 5158511 (E.D.N.Y. July 2, 2015).  But Plaintiff has not even shown a contradiction, let alone a significant one.

Plaintiff's attempts to frame particular statements from Ortiz's deposition as conflicting with Defendants' discovery responses rely on overgeneralizations and mischaracterizations.  For example, despite Plaintiff's arguments to the contrary, Ortiz's testimony that he received "'[o]nline training'" and "'on-the-job training'" at "'other jobs'" regarding "'use of force, de-escalation and eviction procedures,'" (*see* P's Supp. Letter at 3-4 (quoting Ortiz Depo. at 8:9-9:6)), does not contradict Defendants' response that they did not possess any documents

22

constituting "training materials regarding the policies and procedures of the City Marshal's Office relating to carrying out evictions," (*id.* at 3).  Ortiz never testified that the training he received was included in any written training materials maintained by the City, or even that he received such training from the City Marshal's Office.  Indeed, when asked whether any written policies regarding the procedure for carrying out evictions generally exist, Ortiz testified that they were drafted by the State of New York, (*id.* at 6-7 (quoting Ortiz Depo. at 21:20-22:20)), not the City or the Marshal's Office.  Similarly, while Ortiz confirmed that he had previously "'seen or been provided with a use of force or firearms policy,'" that does not mean, as Plaintiff argues, that Defendants inaccurately certified that they were not in control of any policies or procedures on the use of weapons or "regarding the City Marshal's carrying of a personal firearm on duty."  (*Id.* at 7-8 (quoting Ortiz Depo. at 42:17-20).)  Indeed, when asked whether he had received "'any firearms training from the City or the [M]arshal's Office,'" Ortiz testified that he had not.  (*Id.* at 9 (quoting Ortiz Depo. at 43:7-10); *see* ECF No. 66 ("Ds' Opp. to Cross Mot.") at 9 (explaining that "[t]he City Marshal is not a police officer," and that because "[h]is position does not require him to carry a firearm," he holds only a personal firearms license, and "the City provides no firearms training").)  Nor does Ortiz's testimony that there were police officers at the scene of the incident and that he reviewed footage related to the incident support Plaintiff's contention that Defendants were in possession of body camera footage that they withheld.  (*See* P's Supp. Letter at 5 (quoting Ortiz Depo. at 18:14-23).)  The fact that police were present does not mean that they had body cameras on, let alone that Defendants would be in

possession of that footage, and there is no indication that the footage that Ortiz reviewed was anything other than the security camera footage discussed in this Opinion.[22]

And as to Plaintiff's second argument, it is unclear why Plaintiff believes that Ortiz should have had personal knowledge of all information contained in Defendants' discovery responses.  Plaintiff sought discovery from both Ortiz and the City of New Rochelle, (*see* P's Cross Mot. at 46 (directing interrogatories to both Ortiz and the Office of the City Marshal)), and it is unsurprising that Oritz would not be privy to or recall every record or policy within the City's possession.  In fact, Defendants' counsel clarified for Plaintiff during Ortiz's deposition that counsel had drafted the responses on behalf of all three parties by consulting both Ortiz and the City's law department.  (P's Supp. Letter at 15-17 (quoting Ortiz Depo. at 53:3-54:14).)  As such, this argument, like the other arguments in support of Plaintiff's cross-motion, is frivolous, and the motion is thus denied.[23]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and Plaintiff's cross-motion for sanctions is DENIED.  The Clerk of Court is respectfully

---

[22] To the extent that Plaintiff is relying on Defendants' certification that no responsive documents exist as evidence that such documents were withheld, "[i]t is basic that a party cannot be compelled to produce documents that do not exist, and that a requesting party's speculation to the contrary is an insufficient basis on which to direct further responsive efforts by a producing party." *Metzgar v. U.A. Plumbers & Steamfitters Loc. No. 22 Pension Fund*, No. 13-CV-85, 2018 WL 2744904, at *2 (W.D.N.Y. June 6, 2018); *see Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 435 (S.D.N.Y. 2011) ("[A party] cannot simply rely on speculation that [opposing party] is withholding documents.").

[23] Because discovery is complete, (ECF No. 49), and Plaintiff has failed to show that any discovery was improperly withheld, his argument that Defendants' summary judgment motion is premature under Federal Rule of Civil Procedure 56(d), (*see* P's Cross Mot. at 13-14), fails.  *See Adams v. Bloomberg L.P.*, No. 20-CV-7724, 2024 WL 3269274, at *5 (S.D.N.Y. July 2, 2024) (56(d) relief unavailable when summary judgment motions are made after the close of discovery).

directed to terminate the pending motions, (ECF Nos. 55, 62), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: April 13, 2026
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

25